UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANE DOE 1, ET AL.,

    Plaintiffs,

v.

CITY OF HOLYOKE, ET AL.,

    Defendants.

Civil Action No. 22-11701-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS
(Dkt. Nos. 27, 29, & 33))

March 25, 2024

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Plaintiffs are a young adult, identified as Jane Doe 1, who attended Holyoke High School North ("HHSN") and the mothers and next friends of three minors, identified as Jane Doe 2, Jane Doe 3, and Jane Doe 4 (collectively the "Students"), all of whom attended HHSN. Each of the Jane Does was sexually assaulted on the HHSN campus and reported the assault to one or more administrators employed by Holyoke Public Schools ("HPS"). They allege the Defendants—HPS; the City of Holyoke (the "City"); three current and former state receivers, Anthony Soto, Alberto Vazquez, and Stephen Zrike (together the "Receivers"); the Executive Principal for Holyoke High School from 2019-2020, Stephen Mahoney; and the principal of HHSN, Lori McKenna—responded with deliberate indifference to reports of sexual assault and harassment at HHSN and the inadequate responses denied the Students' ability to access educational opportunities at HHSN. In their seven-count Complaint, Plaintiffs seek compensatory and punitive damages for violations of their rights

protected under the Fourteenth Amendment; Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 , *et seq.* ("Title IX"); and Mass. Gen. Laws c. 214, § 1C. Pursuant to 42 U.S.C. § 1983 ("§ 1983"), Plaintiffs jointly seek to recover for violations by HPS and the City (Count I) and also Mahoney and McKenna, in both their personal and official capacities, and the Receivers, in their personal capacities.[1] (Count II). Their Complaint also includes Title IX claims against HPS brought by A.D. on behalf of Doe 2 (Count III), J.M. on behalf of Doe 3 (Count V), and L.B. on behalf of Doe 4 (Count VII) and claims under Mass. Gen. Laws c. 214, § 1C against HPS and the City brought by A.D. on behalf of Doe 2 (Count IV) and J.M. on behalf of Doe 3 (Count VI).

Defendants have moved for dismissal of all seven counts. Together they argue Doe I's claims in Counts I and II are time-barred. The City separately argues the claims against it asserted in Counts I, IV, and VI must be dismissed because it lacks authority to oversee or direct HPS. Citing the authority held by the state-appointed Receiver, HPS also argues it cannot be liable for violations of § 1983 or Title IX set out in Counts I, III, V, and VIII. As to the state law claims asserted on behalf of Doe 2 and Doe 3 in Counts IV and VI, HPS argues dismissal is required because Plaintiffs failed to exhaust administrative remedies before filing suit. The Receivers argue the Complaint lacks sufficient facts to support the personal-capacity claims asserted against them in Count II. Finally, Mahoney and McKenna argue the claims asserted against them in Count II must be dismissed because the official capacity claims are duplicative of the claims against HPS and qualified immunity shields them from suit as to the personal-capacity claims. For the reasons that follow, the court grants the motions filed by the Receivers (Dkt. No. 29) and grants in part and denies in part the motions filed by the City (Dkt. No. 33) and HPS, Mahoney, and McKenna (Dkt. No. 27).

---

[1] Plaintiffs also asserted official-capacity claims against the Receivers but have since voluntarily agreed to dismissal of those claims. (Pls. Opp. Memo., Dkt. 40, 24 n. 4.)

## II.  MOTION TO DISMISS STANDARD

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). For each of their claims Plaintiffs "need show only that their complaint includes enough factual detail to make the asserted claim plausible on its face." *Falmouth Sch. Dep't v. Doe ex rel. Doe*, 44 F.4th 23, 46 (1st Cir. 2022) (internal quotations omitted). Plaintiffs are not required to allege specific facts sufficient to support every necessary element, "'provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 54 F.4th 42, 52 (1st Cir. 2022) (quoting *Falmouth Sch. Dep't*, 44 F.4th at 47.) Dismissal is warranted only where "the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010). When a limitations defense is raised, dismissal is appropriate if the "'allegations leave no doubt that an asserted claim is time-barred.'" *Martin v. Somerset County*, 86 F.4th 938, 942 (1st Cir. 2023) (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)).

## III.  FACTUAL ALLEGATIONS

Plaintiffs' Complaint described five different incidents that occurred at HHSN between October 2017 and October 2021. During those years, HHSN was one of two Holyoke High School campuses operated by HPS under the direction of a state-appointed receiver, rather than a superintendent hired by an elected school committee. Two of the incidents occurred on a campus pathway, commonly referred to as "the Dingle" which passes the athletic fields before reaching the

3

back entrance of HHSN. The Dingle curves through a wooded area and parts of the path are obstructed from view. At the time of the two incidents described in the Complaint, the Dingle was poorly lit and was not monitored by security cameras or security personnel, even though both HPS and City officials were aware that the Dingle had previously been the site of criminal activity, including assaults of students.

The first incident occurred around October 5, 2017, when Doe I was sixteen years old and a junior at HHSN. On the morning of the incident, Doe 1 was walking across the HHSN campus on the Dingle when an adult male, with no affiliation with HHSN, "blitz attacked her from behind, threatened her life and told her he had a gun, assaulted her, attempted to kidnap her, and then stole her phone just as she was able to escape from his grasp." (Compl., Dkt. 1, ¶ 23.) Doe 1 immediately reported the assault to a guidance counselor, who told her to stay home from school for the rest of the week. The counselor did not provide Doe I with information about her rights under Title IX or any other information or assistance to help her cope with the assault and feel safe at school. After her conversation with the guidance counselor, no HHSN employees contacted Doe 1 regarding the incident or its impact on her. Police did respond to the incident and criminal charges were brought against the perpetrator. The trees in the Dingle were trimmed to improve visibility, but they were then allowed to grow back. Following the assault, Doe I suffered from depression, PTSD, and anxiety. She feared going to school and attended classes online for most of her last two years of high school.

The second incident occurred two years later, in the fall of 2019. Doe 2, then a sophomore, was "lured to the Dingle by a fellow male classmate on the football team and was violently sexually assaulted." (*Id.* at ¶ 33.) After the assault, the aggressor "stated 'you're not going to say that I raped you right.'" (*Id.*) Initially, Doe 2 did not report the incident to anyone because she was terrified and believed that HHSN had a "reputation for turning a blind eye to sexual assault complaints." (*Id.* at

34.) Doe 2 continued to see her attacker at school daily and her mental health declined rapidly. Several months later, Doe 2 attempted suicide and was hospitalized. In or about February 2020, Doe 2 and her mother, A.D., reported the violent sexual assault to Stephen Mahoney, then Executive Principal of Holyoke High School. He promised an investigation, but no investigation ever occurred. Doe 2's assailant was never disciplined and HHSN continued to place Doe 2 and her assailant in classes together. No HPS employee ever provided Doe 2 with information about her rights under Title IX or any other information or assistance to help her cope with the assault and feel safe at school. Although Doe 2 was a minor, neither Mahoney, nor any other HPS employee, reported the sexual assault to the Department of Children and Families. After the incident, Doe 2 suffered from depression, anxiety, and PTSD, as well as "educational deprivation and setbacks." (*Id.* at ¶ 50.)

Approximately two years later, the third incident described by Plaintiffs occurred. This incident took place on October 5, 2021 and also involved Doe 2. During one of her morning classes, a paraprofessional, employed by HPS, subjected Doe 2 to sexual harassment. He "leaned in and got inappropriately close to Doe 2" while she was doing classwork, "made inappropriate comments to her about his alleged girlfriend of a sexual nature," and forced her to look at sexually suggestive photos on his phone. (*Id.* at ¶ 43.) Doe 2's classroom teacher witnessed the interaction but did not intervene. The teacher also did not report the incident to an HHSN administrator, even though Doe 2 told the teacher that the interaction made her uncomfortable. At 12:04 PM, Doe 2 reported the incident in an email to HHSN principal, Lori McKenna. Doe 2 never received a response to her email.

After learning about the third incident, Doe 2's mother, A.D., contacted McKenna and Mahoney and asked for an update about the investigation Mahoney had promised when A.D. reported the second incident to him in February 2020. McKenna did not respond to A.D.'s email.

5

Mahoney responded but said he did not know about the second incident. He referred A.D. to a different employee with whom she had not previously spoken.

The fourth incident happened in the afternoon on October 5, 2021. The same paraprofessional involved in the third incident approached Doe 3, then a 15-year-old ninth grader, while she was in an HHSN hallway. He told Doe 3 that she looked nice; "caressed her face and rubbed her cheeks in a sexually suggestive manner"; "called her 'baby' and started to stare intently at her chest, genital area, and buttocks"; "told her to pull up her zipper" on her pants, which was only slightly undone at the top, "[w]hile staring at her vaginal area"; and "ran his fingers through her hair, twisting it." (*Id.* at ¶ 53.) He then grabbed Doe 3 by the arm, dragged her towards the exit, and tried to leave the school with her. Doe 3 was able to pull away and get to an area where there were other HHSN staff. She talked to a teacher and that same teacher saw the paraprofessional assault and harass Doe 3. The teacher did not report the incident to an HHSN administrator or the Department of Children and Families. Doe 3 told her mother, J.M., about what had happened and J.M immediately called McKenna to report the incident. McKenna told J.M. she would call back regarding the report, but did not do so.

J.M. went to HHSN twice to file a report. On October 7, 2021, two days after the third and fourth incidents, she was able to file a report with the HHSN school resource officer and Dean of Students. Despite receiving J.M.'s complaint and complaints from other parents, HHSN staff downplayed the seriousness of the fourth incident and did not notify the police until after J.M. filed her report on October 7, 2021. Even after she filed her report, no one at HHSN provided J.M., or Doe 3, with information about Doe 3's rights under Title IX and there was no Title IX investigation. After the assault, Doe 3 suffered "anxiety, emotional distress, social withdrawal, [and] ongoing fear for her safety" so severe she was deprived of unspecified educational opportunities. (*Id.* at ¶ 67.)

The fifth incident described in Plaintiffs' Complaint occurred shortly before the third and fourth incidents. On or about September 27, 2021, Doe 4, who had recently turned 14 years old, was sexually assaulted by another HHSN student in a hallway at the school. Doe 4 had tried to avoid her assailant that day because he had previously behaved aggressively and possessively towards her and other female students. The assailant and his cousin lured Doe 4 into a hallway at HHSN that was known to be isolated and unmonitored by security cameras. When Doe 4 arrived, the assailant sexually assaulted her and recorded a video of the assault. He later sent the video to classmates via text and posted it on social media. After the assailant shared the video, Doe 4 told some friends that she did not consent and was not comfortable with what had happened. The assailant then pressured Doe 4 to state that the assault had been consensual. He harassed Doe 4 via text messages, on social media, and in-person, both on and off school grounds.

Doe 4 reported the sexual assault and the video to an HHSN guidance counselor and assistant principal two days after the assault occurred. McKenna was informed of the report the same day. Doe 4's mother, L.B., also contacted HHSN. She requested HHSN implement safety measures for Doe 4, including a no-contact order and changes to the assailant's academic schedule to prevent chance encounters. HHSN refused to implement the requested safety measures and Doe 4 did not feel comfortable being in school without a safety plan. She tried to keep up with her schoolwork using HHSN's online portal, but her teachers did not consistently upload assignments to the portal. Doe 4 fell behind in her classes and her grades went down. When Doe 4 returned to HHSN she experienced daily harassment from classmates, felt unsafe, and her mental health declined rapidly. Doe 4 experienced anxiety, depression, and severe suicidal ideation requiring hospitalization. She has also alleged that her educational development was impeded and she was deprived of unspecified educational opportunities.

After the assault, HHSN administrators created documents regarding the incident that contained inaccuracies and refused to make corrections despite repeated requests by L.B. and Doe 4. Administrators also investigated the incident, but the process and resulting report were flawed. Almost a month passed before they interviewed staff members with knowledge of the incident and almost five months passed before they interviewed student witnesses. They did not collect physical evidence, such as documents, text messages, screen shots, videos, or photographs related to the assault. The report also contained references to surveillance footage from the day following the assault, but did not acknowledge that similar footage from the day of the assault had been deleted.

## IV.    DISCUSSION

At the outset, the court notes that this case does not fit neatly within the existing analytic frameworks courts have used to assess whether a school is liable for the harms a student suffers due to student-on-student and teacher-to-student sexual harassment or sexual violence. *Grace v. Bd. of Trs., Brooke East Boston*, 85 F.4th 1, 11 (1st Cir. 2023) (evaluating student-on-student harassment under Title IX); *Doe v. Bradshaw*, 203 F. Supp. 3d 168 (D. Mass. 2016) (evaluating § 1983 and Title IX claims related to sexual abuse by school employee). Such cases typically require a plaintiff to demonstrate that school decisionmakers failed to adequately respond when they knew, or should have known, that a particular student had been subjected to sexual harassment, thereby causing the student to endure "'an abusive educational environment'" when the sexual harassment or abuse continued. *Grace*, 85 F.th 4 at 11 (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)). In this case, the Students' injuries did not result from Defendants' failure to protect them from repeated acts of sexual harassment or assault by the same perpetrators. Three of the four assailants acted once on a single day and the fourth assailant, the only one to act twice, harmed two separate Students in different incidents on the same day. Afterwards, the two adult assailants do not

appear to have posed further risks to the Students and neither of the students who assaulted Doe 2 and Doe 4 is alleged to have committed further assaults, though both continued to attend HHSN. Since none of the Students were repeatedly harmed by an assailant, Plaintiffs' claims focus on the additional harms the Students experienced because Defendants failed to respond reasonably to their reports of sex-based harassment and assault.

A. Section 1983 Claims Against All Defendants

1. Statutory Framework

"To recover under § 1983, a plaintiff must prove that a deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States was carried out by persons acting under color of state law." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (quoting 42 U.S.C. § 1983). Personal capacity claims "must be premised on . . . [a defendant's] own acts or omissions" because, under 42 U.S.C. § 1983, supervisors are not automatically liable for actions of their subordinates. *Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021) (internal quotations omitted). Additionally, qualified immunity protects individuals from liability unless their acts or omissions "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Swartz v. Sylvester*, 53 F.4th 693, 697 (1st Cir. 2022) (internal quotations omitted).

Qualified immunity does not apply to official capacity claims. Injuries caused by those whose "edicts or acts may fairly be said to represent official policy" are properly considered the responsibility of the government entity, not the individual, and official capacity claims are treated as claims against the individual's government employer. *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 62 (1st Cir. 2015). Under § 1983, municipal employers may be liable when an official policy or custom gives rise to a Constitutional violation. *Walden v. City of Providence*, 596 F.3d 38, 55 (1st Cir. 2010). However, state defendants are not only immune from suit in federal court, they also

9

are not considered "persons" for purposes of § 1983 and cannot be ordered to pay damages in actions brought under the statute. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).

    2. Statute of Limitations

Although § 1983 does not contain a statute of limitations, the Supreme Court has held that federal courts should apply "the most appropriate or analogous state statute of limitations" to claims brought pursuant to § 1983. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987). Plaintiffs argue the thirty-five-year limitations period applicable to sexual abuse of minors should apply to Doe I's claims in this case because they arise out of a sexual assault that occurred when she was a minor. Mass. Gen. Laws c. 260, § 4C. Defendants contend the more appropriate state statute of limitations to apply in this case is the three-year limitations period broadly applicable to tort actions. Mass. Gen. Laws c. 260, § 2A. The court agrees with Defendants; the thirty-five-year statute of limitations cited by Plaintiffs only applies to "[a]ctions of tort alleging the *defendant* sexually abused a minor" and there are no allegations in this case that any of the defendants sexually abused Doe I, or any other child. Mass. Gen. Laws c. 260, § 4C (emphasis added).

The incident involving Doe I occurred on or about October 5, 2017, when she was sixteen years old. The statute of limitations did not begin to run until October 30, 2018, when Doe I turned eighteen. Mass. Gen. L. c. 260, § 7; Mass. Gen. L. c. 231, § 85P. Massachusetts also tolled all statutes of limitations for 106 days, from March 17, 2020 through June 30, 2020, due to the COVID-19 pandemic. *Shaw's Supermarkets, Inc. v. Melendez*, 173 N.E.3d 356, 358 (Mass. 2021). However, even excluding the time while Plaintiff remained a minor and the time tolled for the pandemic, the three-year statute of limitations expired before Plaintiffs filed their Complaint on October 5, 2022. Though Doe I's claims against all Defendants will be dismissed as untimely, the court will consider the factual allegations related to her claim to the extent they are relevant to the remaining claims.

3. Claims Against HPS and the City of Holyoke

"Municipal defendants may be held liable under § 1983 for actions taken pursuant to an official policy or an official custom that violated the Constitution." *Walden*, 596 F.3d at 55. A policy or custom is attributable to a municipality if it was adopted or condoned by a municipal employee "'with final policymaking authority.'" *Id.* (quoting *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008)). Whether a particular government official has "final policymaking authority" is a question of law decided by "look[ing] to state law, including 'valid local ordinances and regulations,' for descriptions of the duties and obligations of putative policymakers in the relevant area at issue." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)(plurality opinion)).

In Massachusetts, the policymaking authority for public schools is usually a town or city school committee. Mass. Gen. Laws c. 71, § 37 ("The school committee in each city and town . . . shall have the power to select and terminate the superintendent . . . and shall establish educational goals and policies for the schools in the district . . . ."); *see also Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 306 (D. Mass. 2017) ("Under Massachusetts law, the school committee in each city or town has policymaking authority."). Under § 1983, a city or town may be liable for constitutional violations that occur in its public schools if it exercises authority over its school committee. *See Doe v. Gavins*, Civ. Action No. 22-cv-10702-ADB, 2023 WL 6296398 (D. Mass. Sept. 27, 2023) (accepting the plaintiffs' assertions that the City of Boston acts through its school committee to oversee operation of its public schools and denying, in part, its motion to dismiss the plaintiffs' § 1983 claims). The City does not dispute these general principles, but persuasively argues it lacked authority to establish customs or policies for HPS and, therefore, has no liability under § 1983 for any actions by HPS employees.

During the relevant time period, HPS was not overseen by a superintendent hired by a local school committee. Instead, a receiver, selected by the state Board of Elementary and Secondary Education, exercised "all the powers of the superintendent and school committee." Mass. Gen. Laws c. 69, § 1K. When the powers previously held by the Holyoke School Committee ("HSC") were transferred, the Receiver became the final policymaking authority for HPS. The HSC, the City, and the City's employees lost any authority they previously had under state law to establish policies for HPS.[2] The court, therefore, will dismiss Plaintiffs' § 1983 claims against HPS and the City.

4.  Claims Against Receivers

While serving in the receiver role, each of the Receivers had supervisory responsibility for HPS, but they cannot be held liable under § 1983 for the actions of HPS employees, only their own acts and omissions and only if those actions or omissions were affirmatively linked to Plaintiffs' injuries. *Justiniano*, 986 F.3d at 20. Plaintiffs have not alleged any specific acts or omissions by any of the Receivers or that they had knowledge or constructive knowledge that Plaintiffs faced a grave risk of harm, as required to demonstrate deliberate indifference. *Id.* (explaining that criteria for establishing supervisory liability based on a failure to train are stringent and require a showing of deliberate indifference). There are no allegations that Plaintiffs, or anyone else, reported either the specific incidents or the inadequate responses provided by HPS staff to the Receivers. The Complaint does state that Doe 2 was aware HHSN had a reputation for not responding appropriately to complaints alleging sexual assaults by male students, but this conclusory allegation is unsupported by factual allegations regarding the basis for that reputation, how widely that reputation was known, or by whom. In the absence of any specific allegations connecting one or more of the

---

[2] Having determined that the appointment of the receiver stripped the HSC of its final policymaking authority for HPS, the court does not reach the City's argument that it can never be liable under § 1983 for actions by the HSC because the HSC operates without the City's oversight.

Receivers to the injuries suffered by Plaintiffs, the court cannot infer "more than the mere possibility of misconduct." *Id.* at 19 (internal quotations omitted). The court will, therefore, dismiss Plaintiffs' personal-capacity claims against the Receivers.

      5.   Claims Against Mahoney and McKenna

Plaintiffs claim Mahoney and McKenna are liable in both their personal and official capacities for implementing "unconstitutional policies, practices, and/or customs" that violated Plaintiffs' rights "[u]nder the Fourteenth Amendment . . . to personal security, bodily integrity, Equal Protection of Law, and to be free from sexual assault and sex-based harassment and discrimination while attending HPS." (Compl., Dkt. 1, ¶ 91.) The court does not address the official-capacity claims in this section because they are duplicative of the claims asserted directly against HPS and addressed above. *Rosaura Bldg. Corp.*, 778 F.3d at 62 ("A suit against a public official in his official capacity is a suit against the government entity."). As to the personal-capacity claims, the doctrine of qualified immunity protects McKenna and Mahoney from liability unless "their actions or decisions . . . violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Swartz*, 53 F.4th at 699 (internal quotations omitted). "Under the familiar two-prong framework, courts ask (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)). Qualified immunity applies if either prong is not met. *Id.*

The court considers first whether McKenna and Mahoney's own actions violated Plaintiffs' substantive due process rights. The Due Process Clause protects against egregious abuses by government actors, but does not "impos[e] liability whenever someone cloaked with state authority causes harm" or guarantee that officials will use care when acting on behalf of the state. *County of*

13

*Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998). "To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must allege facts so extreme and egregious as to shock the contemporary conscience." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59-60 (1st Cir. 2020) (internal quotation marks omitted); *see also Martínez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010).

The Due Process Clause of the Fourteenth Amendment "'does not guarantee minimum levels of safety or security,'" but it does protect the right to bodily integrity from invasions by government actors. *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 110-12 (D. Mass. 2019) (quoting *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 52 (1st Cir. 2006)). The right is clearly violated when a public-school employee sexually abuses a student, as occurred when the paraprofessional sexually assaulted Doe 3. *Bradshaw*, 203 D. Supp. 3d at 177. However, supervisory liability for the paraprofessional's violation of Doe 3's bodily integrity exists only if "'the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.'" *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (quoting *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 902 (1st Cir. 1988) (alterations in original). "A plaintiff can establish that 'affirmative link' by alleging that the supervisor was 'a primary violator or direct participant in the rights-violating incident,' or that 'a responsible official supervises, trains or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'" *Morales v. Chadbourne*, 793 F.3d 208, 221 (1st Cir. 2015) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009)). "Deliberate indifference . . . 'will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.'" *Pineda*, 533 F.3d at 54 (quoting *Hegarty v. Somerset Cty*, 53 F.3d 1367, 1380 (1st Cir. 1995)).

Plaintiffs have not alleged direct participation by Mahoney or McKenna, but contend they were deliberately indifferent in supervising the paraprofessional. None of the facts in the Complaint support an inference that Mahoney had notice that the paraprofessional posed a risk to students prior to the assault on Doe 3. In the absence of knowledge, no reasonable official in Mahoney's position would have felt a need to act to prevent the paraprofessional from physically harming a student.

The same is not true with respect to McKenna. After the paraprofessional sexually harassed Doe 2 on the morning of October 5, 2021, she reported the incident to McKenna in an email sent at 12:04 PM. Doe 3 was not sexually assaulted by the paraprofessional until the end of the school day. Whether McKenna can be held liable for failing to prevent the paraprofessional from harming Doe 3 will, of course, depend on when she read Doe 2's email and whether the content of the email would have put a reasonable school administrator on notice that immediate intervention was required to prevent the paraprofessional from depriving a student of their right to bodily integrity. However, at this early stage, the specific allegations regarding the paraprofessional's conduct toward Doe 2 and her email to McKenna are sufficient to support a reasonable inference that McKenna was deliberately indifferent to the risk the paraprofessional posed, and that the risk was very likely to include a violation of a student's well-established, constitutionally-protected, right to bodily integrity.

A separate analysis applies to determine whether McKenna or Mahoney could be liable for the assaults by the other assailants. "In general, the state's failure to protect an individual from private harm does not give rise to a due process claim." *Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 75 (1st Cir. 2021). The state-created danger doctrine provides an exception to the general rule, available only in the very limited circumstances when a plaintiff can establish:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

15

   (3) that the act or acts caused the plaintiff's harm; and
   (4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Id.* (quoting *Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020)).

  Plaintiffs have not alleged Mahoney or McKenna took any "affirmative actions that enhanced the danger" to the Students. *Id.*; *see also Morgan v. Town of Lexington*, 823 F.3d 737, 743-44 (1st Cir. 2016) (ruling administrators' failure to effectively stop student bullying was "not action by the state to create or increase the danger" faced by the bullied child). Even if Mahoney or McKenna knew that the seclusion offered in the Dingle and certain HHSN hallways attracted wrongdoers, their inaction did not increase the risks those spaces posed specifically to the Students. Nor have Plaintiffs alleged that criminal activity in those areas was so rampant that failure to take remedial steps shocks the conscience. Approximately two years passed between the two assaults that occurred in the Dingle and another two years passed before Doe 4 was assaulted in a secluded hallway. For these reasons, the court finds Plaintiffs have failed to adequately allege Mahoney and McKenna violated their substantive due process rights by failing to prevent the assaults by other students.

  Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs have a right to be free from government discrimination on the basis of sex. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009). "In order to prevail on an equal protection claim based upon alleged selective denial of protection, 'plaintiffs must adduce competent evidence of purposeful discrimination.'" *Melendez–Garcia v. Sanchez*, 629 F.3d 25, 38 (1st Cir. 2010) (quoting *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998)). The Supreme Court has explained that "[d]iscriminatory purpose . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 57 (1st Cir. 2023) ("A theory of unintentional discrimination . . . requires proof of both disparate impact and discriminatory intent."). Plaintiffs' Complaint is devoid of

16

allegations suggesting Mahoney and McKenna acted, or abstained from acting, because of the Students' sex. For the forgoing reasons, the personal-capacity claims against Mahoney are dismissed in their entirety and the claims against McKenna are dismissed, except for the claim based on her failure to intervene to prevent the paraprofessional from violating Doe 3's bodily integrity.

    B. Title IX Claims Against HPS

Title IX prohibits gender-based discrimination in education programs that receive federal funding and includes "an implied private right of action . . . through which an aggrieved party may seek money damages against an educational institution." *Grace*, 85 F.4th at 10. Although there is some overlap between the rights protected by the Equal Protection Clause and Title IX, different requirements must be met to establish liability for violations. *Fitzgerald*, 555 U.S. at 257. Of particular relevance in this case, the limits on supervisory and municipal liability applicable to claims brought under § 1983 do not apply to Title IX claims. *Id.* Instead, "a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference." *Id.*

As a recipient of federal funding, HPS "can be liable for a claim of student-on-student and teacher-to-student harassment" if a student was subjected to sex-based harassment "'sufficiently severe and pervasive to create an abusive educational environment'" and an HPS employee "'authorized to take correction action . . . exhibited deliberate indifference' to the harassment." *Grace*, 85 F.4th at 11-12 (quoting *Frazier*, 276 F.3d at 66). An abusive educational environment can develop when a student is harmed by repeated harassment, but "a single instance of peer-on-peer [or staff-to-student] harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Fitzgerald v.*

17

*Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). The Title IX claims brought on behalf of Doe 2, Doe 3, and Doe 4 fall into the second category.

Plaintiffs have alleged that after Doe 2 was sexually assaulted on HHSN grounds by another HHSN student and the assault was reported to Mahoney, HPS employees failed to offer her any support and did not investigate the assault. As a result of that inaction, Doe 2 was unable to access educational opportunities without fear of encountering her assailant. Doe 3 also struggled to access educational opportunities because of anxiety, emotional distress, and safety fears she experienced because HPS employees downplayed the seriousness of the conduct of the paraprofessional who sexually assaulted her, conducted no investigation, and took no remedial steps to prevent similar incidents from happening in the future. While HPS employees did conduct an investigation after Doe 4 reported being sexually assaulted by another student to multiple HHSN employees, including McKenna, Plaintiffs allege the investigation was deeply flawed. They contend that the flawed investigation and refusal of HPS employees to address Doe 4's safety concerns harmed Doe 4 and deprived her of educational opportunities. At this early stage, the court finds the severity of the alleged incidents and the failure of HPS employees to take remedial measures to support Doe 2, Doe 3, and Doe 4 are sufficient to state a Title IX against HPS.

C. Mass. Gen. Laws c. 214, § 1C Claims Against HPS and the City

Finally, the court turns to the state law claims asserted on behalf of Doe 2 and Doe 3, the two victims of the HPS paraprofessional, pursuant to Mass. Gen. Laws c. 214, § 1C ("§ 1C"). That "statute gives students who are sexually harassed in violation of [Mass. Gen. Laws] c. 151C, § 2(g), access to the remedial provisions of [Mass. Gen. Laws] c. 151B, § 9." *Lowery v. Klemm*, 845 N.E.2d 1124, 1129 (Mass. 2006). Under this statutory regime, a municipality operating "a school is strictly

liable . . . for the sexual harassment of a student by a teacher." *Doe v. Town of Hopkinton*, 34 Mass. L. Rptr. 137, 2017 WL 1553440, *4 (Mass. App. Ct. 2017).

The City has argued the claims against it should be dismissed because it lacked knowledge and had no authority over HPS. This argument, though persuasive in the context of Plaintiffs' § 1983 claims, where there are significant limits on vicarious and municipal liability, is inapplicable to claims brought under § 1C, where an employer is strictly liable for a teacher's misconduct towards a student. Plaintiffs have alleged that HPS employees are also City employees and the authority the City relies on to establish that it lacks authority to direct HPS does not resolve the factual question of whether the City is the employer of record for HPS employees.

HPS has argued the § 1C claims against it must be dismissed because Plaintiffs did not first exhaust administrative remedies by filing a complaint with the Massachusetts Commission Against Discrimination ("MCAD") as required under Mass. Gen. Laws c. 151B, § 9 and in the text of § 1C. However, because "the procedure for filing complaints with the MCAD . . . applies only to '[a]ny person *seeking admission as a student* to any educational institution, or enrolled as a student in a vocational training institution,'" courts have previously interpreted § 1C as permitting plaintiffs like the Students to bring a civil action in court without first filing a complaint with the MCAD. *Morrison v. Northern Essex Comm. Coll.*, 780 N.E.2d 132, 135 n. 6 (Mass. App. Ct. 2002); *see also Doe v. Town of Stoughton*, Civ. No. 17-cv-12337-IT, 2020 WL 4431569, *8-9 (D. Mass. July 31, 2020); *Harbi v. Mass. Inst. of Tech.*, Civ. No. 16-12394-FDS, 2017 WL 3841483, *7 (D. Mass. Sept. 1, 2017). For these reasons, the court will not dismiss the § 1C claims asserted on behalf of Doe 2 and Doe 3.

V. CONCLUSION

For the foregoing reasons, the Receiver's Motion to Dismiss (Dkt. No. 29) is ALLOWED; the City's Motion to Dismiss (Dkt. No. 33) is ALLOWED as to Count I and DENIED as to Counts

IV and VI; and the Motion to Dismiss filed by HPS, Mahoney, and McKenna (Dkt. No. 27) is ALLOWED as to Counts I and II, except that it is DENIED as to the Count II personal-capacity claim against McKenna based on her failure to prevent the paraprofessional from sexually assaulting Doe 3, and DENIED as Counts III through VII.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge